UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

PAULA A. BURGESS,

          Plaintiff,

   -vs-


CAROLYN W. COLVIN,
ACTING COMMISSIONER OF
SOCIAL SECURITY

          Defendant.

_____

**DECISION AND ORDER**
**No. 13-CV-6177(MAT)**

## INTRODUCTION

Plaintiff, Paula A. Burgess ("Plaintiff" or "Burgess"), brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, claiming that the Commissioner of Social Security ("Commissioner" or "Defendant") improperly denied her application for Supplemental Security Income ("SSI").

Currently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set forth below, the Court grants the Commissioner's motion, denies the Plaintiff's cross-motion, and dismisses the Complaint.

## PROCEDURAL HISTORY

On September 15, 2009, Plaintiff filed an application for SSI, alleging disability as of February 1, 2009 due to bone dysfunction in her neck, back and shoulders, high blood pressure, thyroid problems and asthma.  Administrative Transcript [T.] 183.  On December 16, 2009, the application was denied.  T. 71, 72-77, 82-

87.   At Plaintiff's request, an administrative hearing was conducted before administrative law judge ("ALJ") John P. Costello, at which Plaintiff, who appeared with a representative, testified as did a vocational expert ("VE").  T. 26-70, 88-90.  On August 8, 2011, the ALJ issued a decision finding that Plaintiff was not disabled during the relevant period.  T. 16-22.

The Appeals Councils denied Plaintiff's request for review, making the ALJ's Decision the final decision of the Commissioner. T. 1-4.  This action followed.

## FACTUAL BACKGROUND

### Plaintiff's Physical Health History

Prior to the protective filing date of September 15, 2009, Plaintiff was treated in 2008 at Orthopedic Associates of Rochester ("OAR") for right shoulder discomfort and was diagnosed with AC joint athrosis and mild impingement syndrome.  She was prescribed ibuprofen and physical therapy ("PT").  T. 221-222.

On September 5, 2008, Plaintiff was seen at East Ridge Family Medicine ("ERFM") for swollen ankles.  T. 234.  She was diagnosed with peripheral edemea and prescribed Lasix.  T. 234-235.  Later in September, Plaintiff returned to ERFM and reported that she had attended PT and had taken ibuprofen, which made her shoulder feel better.  T. 223-224.  Upon examination, Plaintiff's shoulder had excellent range of motion and only mild discomfort with internal rotation.  Plaintiff's rotator cuff strength was full and equal,

her impingement sign was negative, and she was advised to continue PT and perform home exercises after PT ended.  T. 223.

In July 2009, Plaintiff returned to ERFM and complained of increasing pain in her right shoulder, neck and back.  T. 229. Upon physical examination, Plaintiff's lower back, right shoulder and trapezius were tender to palpation.  Diana Herrmann, M.D. reported that Plaintiff was disabled from her regular duties and was totally disabled since January 2009.  Plaintiff was prescribed Flexeril, ibuprofen, given a weight restriction for lifting, and referred to an orthopedist.  T. 229.

On September 9, 2009, Plaintiff returned to ERFM to have a form for County Social Services completed.  Dr. Herrmann noted that Plaintiff failed to follow-up with an orthopedist and had stopped PT.  Plaintiff was again referred to an orthopedist.  T. 227-228.

In November 2009, after the protective filing date of September 15, 2009, Sandra Boehlert, M.D. performed a consultative examination of Plaintiff.  T. 248-251.  Dr. Boehlert noted that Plaintiff did not use an assistive device, had a normal gait and stance, she could walk heel to toe, could fully squat, was able to rise from a chair without a problem, could get on and off the exam table, and could change for the exam without assistance.  T. 249. Dr. Boehlert also noted that Plaintiff's cervical spine showed full flexion and extension bilaterally, and that she had no scoliosis, kyphosis, or abnormality in her thoracic spine.  Plaintiff's lumbar spine showed limited flexion, full extension, and full rotary

movement.  Her straight leg raises were negative bilaterally, she had full range of motion in her shoulders, elbows, forearms, and wrists bilaterally.  Dr. Boehlert noted that Plaintiff had full range of motion in her hips, knees, and ankles bilaterally, and full strength in her upper and lower extremities.  T. 250. Dr. Boehlert reported that Plaintiff's x-rays of her lumbosacral spine showed degenerative changes at L5-S1, normal sacroiliac joints, and no fracture dislocation.  T. 252.  Dr. Boehlert opined that Plaintiff had "moderate limitations to heavy exertional activity during episodes of athralgias[,]" but that she had no chronic daily long-term limitations.  T. 251.

In December 2009, Plaintiff was seen by Christine Hamblin, RPA at OAR complaining of increased pain and limited movement in her right shoulder.  T. 285.  Hamblin noted that Plaintiff's active shoulder range of motion was approximately 50% due to pain and her passive range of motion was near full with discomfort.  T. 285. She noted that Plaintiff's apprehension test and relocation tests were mildly positive, her drop arm test was negative, and her rotator cuff strength was full with pain on testing.  Hamblin administered a steroid injection and told Plaintiff to return in five weeks.  T. 283-284.

On January 12, 2010, Hamblin saw Plaintiff again, at which time Plaintiff reported that her shoulder felt 80% better after the December injection.  T. 283.  Upon examination, Hamblin reported that Plaintiff's range of motion had significantly improved and was

nearly 100% in all directions.  Hamblin reported that Plaintiff was doing "excellent," and recommended that Plaintiff do strength exercises and return on an as-needed basis.  T. 284.

On March 5, 2010, Plaintiff saw Dr. Herrmann for a follow-up from 2009.  T. 359.  Dr. Herrmann noted that Plaintiff reported that she broke up with her boyfriend, moved to an apartment with her teenage son, and she was caring for her ailing mother in hospice.  T. 359.  Upon examination, Dr. Herrmann reported that Plaintiff appeared tired, that she had a wheeze on lung examination, and that Plaintiff was back to smoking again.  T. 359, 360.

In April 2010, Plaintiff met with RPA Christina Hatfield at OAR for recurring right shoulder pain.  T. 281-282.  Upon examination, Hatfield reported that Plaintiff's cervical spine was non-tender and exhibited pain-free range of motion.  T. 282. Plaintiff's right shoulder retained full active forward elevation and abduction with mild impingement and was able to reach behind her back and rotate below the T12 level.  Hatfield noted that Plaintiff's rotator cuff strength was intact and that Plaintiff was minimally tender to palpation over the AC joint.  Hatfield assessed rotator cuff tendonitis, administered a cortisone injection, and recommended follow-up on an as needed basis.  T. 282.

On May 26, 2010, Plaintiff saw Dr. Herrmann stating that she was "miserable" and complaining of problems with her peripheral edema.  T. 350.  Upon examination, Dr. Herrmann reported that

Plaintiff had a trace of edema around her lateral malleolus, but that she was "not impressed with any degree of edema." Dr. Herrmann advised Plaintiff to limit her salt intake and elevate her legs in hot weather.  Dr. Herrmann also noted that Plaintiff continued to smoke.  T. 351.

In August 2010, Plaintiff saw RPA Hamblin again complaining of right shoulder pain and limited movement.  Hamblin examined Plaintiff and noted that Plaintiff "overall appeare[d] to be in no acute distress[,]" her C-spine was supple and pain-free with range of motion, her right shoulder elevation was painful, her internal rotation was limited, and Plaintiff had a "strongly positive" impingement sign.  Hamblin noted that Plaintiff was tender along the coracoid ligament, her drop arm test was negative, her rotator cuff strength appeared intact, and no gross neurovascular deficits were present.  Plaintiff was given a steroid injection, instructed to rest her shoulder in a sling and perform exercises, and to return in four weeks.  T. 280.

In September 2010, Plaintiff saw Hamblin reporting that her pain and range of motion had significantly improved since her steroid injection and she denied any weakness.  Hamblin assessed that Plaintiff's shoulders had normal and equal range of motion, impingement signs were negative, her rotator cuff strength was full, and she had no gross neurovascular deficits.  Plaintiff declined referral to physical therapy and was instructed to continue home exercise, as well as icing and elevation.  T. 278.

Plaintiff returned to Hamblin in October 2010 and her findings were generally unchanged since Plaintiff's last visit.  Hamblin noted that Plaintiff was doing "excellent," advised her to continue with her strengthening exercises and to avoid heavy lifting, pushing, and pulling.  T. 276.

In January 2011, Plaintiff returned to Dr. Herrmann complaining of constant back pain for the past three weeks. Dr. Herrmann noted that Plaintiff exhibited tenderness to low back palpation and had pain that radiated from her mid-back. Plaintiff's strength and sensation in her lower extremities was reported as "good."  Dr. Herrmann noted that Plaintiff was unable to work and that she was totally disabled.  T. 343.

On March 23, 2011, Plaintiff saw Clifford Everett, M.D. of Strong Memorial Hospital's orthopedics departments complaining of neck and low back pain.  Plaintiff reported that her pain had started after an auto accident in 2007, that her activities were limited, and that medication gave her little relief. T. 269, 271. Diagnostic imaging of Plaintiff's cervical spine showed degenerative changes.  T. 271.  Dr. Everett noted that Plaintiff's gait was normal, she could heel to toe walk, her straight leg tests were negative, her sensory and reflex exams were normal, and her strength was full.  T. 270-271.

On March 30, 2011, Plaintiff underwent a lumbar spine MRI that showed severe degenerative disease at L5-S1 with disc bulge,

intravertebral space and bilateral neuroforminal narrowing, and mild spinal stenosis. T. 272-273.

In April 2011, Plaintiff returned to Dr. Everett complaining of back and neck pain. She reported that pain medications afforded little relief and restricted her activities. T. 267. Dr. Everett advised Plaintiff that there was no surgical option or injection for her condition and recommended pain management. T. 268, 272-273. Dr. Everett opined that Plaintiff was limited from prolonged sitting and standing and that she needed to change positions hourly. He assessed that Plaintiff could lift up to 20 lbs occasionally and 10 lbs frequently. T. 268.

Also in April 2011, Plaintiff saw Dr. Herrmann again, who noted that Plaintiff did not take her thyroid medication and failed to use her inhaler, as directed. T. 336. On May 17, 2011, Dr. Herrmann completed disability paperwork for Plaintiff, and noted that Plaintiff had been referred to a pain clinic but had failed to show up. T. 334-335.

Dr. Herrmann completed a medical assessment form that same day. She assessed that Plaintiff could lift or carry no more than 2 lbs, stand/walk 30 minutes at a time for 1 hour in a workday, and sit 30 minutes at a time for a cumulative total of 4 hours in a workday because of degenerative disc disease. T. 264-265. Dr. Herrmann indicated that Plaintiff could occasionally climb and balance and could never perform other postural activities. T. 256. Dr. Herrmann also indicated that reaching and pushing/pulling were

affected by Plaintiff's right shoulder rotator cuff tendonitis. T. 265. Dr. Herrmann also opined that Plaintiff could not climb to heights and could not tolerate environmental irritants such as dust, fumes, and humidity. T. 266. Dr. Herrmann also indicated that Plaintiff had restrictions with respect to heights, machinery, temperature extremes, chemicals, dust, fumes and humidity. T. 256. On May 25, 2011, Dr. Herrmann completed a form for Plaintiff to get a handicapped parking permit, at which time she indicated that Plaintiff had low back pain and degenerative disc disease and that Plaintiff could not walk 200 feet without stopping. T. 211.

In June 2011, Plaintiff saw Hamblin, who conducted a physical examination of Plaintiff and instructed her to avoid lifting, pushing, and pulling heavy items. T. 325. Also in June 2011, Dr. John E. Klibanoff of OAR completed a medical assessment form, in which he indicated that Plaintiff could occasionally lift 5 lbs and could lift an unknown amount once every four hours, she could never climb, was able to frequently balance, and could occasionally kneel, crawl, crouch, and stoop. T. 322. Dr. Klibanoff assessed that Plaintiff had no limitations with respect to her ability to sit, stand, and walk. T. 321-322. Dr. Klibanoff also assessed that, due to Plaintiff's shoulder tendonitis and limited shoulder movement, Plaintiff's abilities to reach, handle, push, and pull were affected, and that she had no environmental limitations. T. 323.

**Plaintiff's Mental Health History**

Prior to the protective filing date of September 15, 2009, Plaintiff received mental health treatment for depression since 2000.  T. 291.

After the protective filing date, Plaintiff was seen periodically at the Behavioral Health Network for depression and stress-related issues.  T. 292-317, 318-320.  Plaintiff was treated with counseling sessions and medication, although she sometimes missed appointments and did not use her prescribed medications. T. 294, 312, 352.

On May 26, 2011, Plaintiff's therapist Tammie Raucci, MSW, completed a mental limitation form.  T. 289-291.  Raucci assessed that Plaintiff had moderate limitations in most areas of mental functioning, except for moderately severe limitations in responding to supervision and work pressures, meeting attendance, quality and production standards, and mild limitations in memory, orientation, hallucinations.  She also noted that Plaintiff had no delusions, illogical associations of ideas, autistic or regressive behaviors. T. 289-291.  Raucci diagnosed Plaintiff with major depressive disorder.  T. 293.

**Hearing Testimony**

**<u>Plaintiff's Testimony</u>**

Plaintiff, who was born in 1962, previously worked as a gas station attendant, a waitress, a secretary, and a cashier at Rite Aid.  T. 31-38.

Plaintiff testified that she receives welfare from social services, Medicaid, and food stamps. T. 31. According to her, she is unable to work due to her health problems, including a sore lower back, arthritis in her right shoulder and neck, pain in her left rotator cuff, asthma, and depression. T. 38-50.

Plaintiff testified that the heaviest weight she can lift is her 7 lb grandson. T. 41. She also testified that she can sit for about 20 minutes and then needs to stand, but can only do so for about 25 minutes. T. 42. Plaintiff testified that she takes various medications for her back pain, the strongest of which is Oxycodone. T. 43.

With respect to her right shoulder issues, she testified that she gets cortisone injections, which help "immensely." T. 45. She testified that she can reach overhead "as long as [she] doesn't have to keep doing it." T. 46.

Plaintiff testified that she takes Advair and Dunalen for her asthma. T. 48.

With respect to her neck, Plaintiff testified that she has arthritis and that she has never had surgery for the problem. She takes "pain pills," muscle relaxers and administers hot compresses. T. 50. Turning her head makes the pain worse. T. 50.

Plaintiff also testified that she suffers from depression and has received treatment at Rochester Mental Health for years. She testified that she finds therapy sessions helpful and that she takes medications for her depressive condition that help her cope.

T. 52.  Plaintiff testified that she has problems sleeping, takes sleeping pills, and naps during the day.  T. 52-53.  According to her, she has gained about 25 lbs in the past three months as a result of her depression, which has caused her ankles and feet to swell.  T. 54.

Plaintiff testified that on an average day she wakes up, has breakfast, and watches television.  T. 57.  She testified that she has a driver's license and a car and sometimes drives to the grocery store, her daughter's house or her brother's house when her son lets her have the car.  T. 58.

**The VE's Testimony**

A VE testified that Plaintiff was a younger individual with a high school education.  T. 65.  The ALJ set forth a hypothetical of an individual of Plaintiff's age, education, and past work experience who could perform light work, was limited to simple, repetitive tasks, occasional overhead reaching, had to avoid concentrated or excessive exposure to respiratory irritants and other environmental extremes.  T. 65-66.  The VE testified that such a person could not perform Plaintiff's past work.

The ALJ then asked the VE to considered the same hypothetical as the first except that he added that the person would be off task 25% of the time due to impaired concentration.  The VE testified that such a person could not work.  T. 67.

The ALJ then posed a third hypothetical identical to the first but that the individual was able to perform sedentary work.  T. 67-

68.  The VE testified that there were jobs in significant numbers in the national economy that such a person could perform, including general assembler and addresser.  T. 51.

## DISCUSSION

## I. Jurisdiction and Scope of Review

42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. Section 405(g) provides that the District Court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g)(2007). The section directs that when considering such a claim, the Court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. Substantial evidence is defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Metropolitan Stevedore Co. v. Rambo, 521 U.S. 121, 149 (1997).

Section 405(g) limits the scope of the Court's review to two inquiries: determining whether the Commissioner's findings were supported by substantial evidence in the record as a whole, and whether the Commissioner's conclusions are based upon an erroneous

legal standard.  Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003); see also Mongeur, 722 F.2d at 1038 (finding a reviewing court does not try a benefits case de novo).

Under Rule 12(c), judgment on the pleadings may be granted where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings.  Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988).  A party's motion will be dismissed if, after a review of the pleadings, the Court is convinced that the party does not set out factual allegations that are "enough to raise a right to relief beyond the speculative level."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

## II. The Commissioner's Decision Denying Plaintiff Benefits is Supported by Substantial Evidence in the Record

The Social Security Administration has promulgated a five-step sequential analysis that the ALJ must adhere to for evaluating disability claims.  20 C.F.R. § 404.1520.  Pursuant to this inquiry:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner considers whether the claimant has a "severe impairment" which significantly limits his ability to do basic work activity. If the claimant has such an impairment, the Commissioner considers whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1, Part 404, Subpart P. If the claimant does not have a listed impairment, the Commissioner inquires whether, despite the claimant's impairment, he has the residual functional

> capacity to perform his past work. If he is
> unable to perform his past work, the
> Commissioner determines whether there is other
> work which the claimant can perform.

Berry v. Schweiker, 675 F.2d 464, 466-67 (2d Cir. 1982).

The ALJ in this case used this sequential procedure to determine Plaintiff's eligibility for disability benefits. The ALJ first found that Plaintiff did not engage in substantial gainful activity since September 15, 2009. T. 18. At step two, the ALJ found that Plaintiff had the severe impairments of cervical and lumbar pain, right shoulder tendonitis, depression, peripheral edema, obesity, and asthma. T. 18-19. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one the Listed Impairments. T. 19. The ALJ then found that Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work, except that she is limited to simple, repetitive tasks and occasional overhead reaching and must avoid concentrated exposure to respiratory irritants. T. 20-21. Next, the ALJ found that Plaintiff is unable to perform any past relevant work but that considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. T. 21-22. Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. T. 22.

The Commissioner argues that the ALJ's decision is supported by substantial evidence and correct as a matter of law. Dkt. No. 9-1. Plaintiff counters, arguing that: (1) the Commissioner

erred in omitting a discussion of Listing 1.04 at Step 3 of the sequential evaluation; (2) the Commissioner's determination that Plaintiff is not disabled is against the weight of the substantial evidence, and violates the treating physician rule; (3) the Commissioner improperly assessed Plaintiff's credibility and her complaints of pain and other symptoms; (4) the vocational expert was not properly qualified; and (5) the SCO guidelines do not support the demands of the ALJ's proposed occupations.   Dkt. No. 12-1 at Points A-E.

### A.   Listing 1.04(C)

At Step 3 of the sequential analysis, the ALJ considered whether Plaintiff had an impairment or combination of impairments that met or equaled Listing 1.00 for disorders of the musculoskeletal system.   T. 19.   Plaintiff argues that the ALJ erred, however, in also failing to consider whether her back impairment met or medically equaled Listing 1.04(C) ("Disorders of the Spine").   Dkt. No. 12-1 at Point A.

"The Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability." DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). "The regulations also provide for a finding of such a disability per se if an individual has an impairment that is 'equal to' a listed impairment." Id. (citing 20 C.F.R. 404.1520(d) ("If you have an impairment(s) which . . . is listed in appendix 1 or is equal to a

listed impairment(s), we will find you disabled without considering your age, education, and work experience.")).

Individuals suffering a disorder of the spine are disabled per se if they meet the criteria specified in the regulations.  The listing plaintiff claims the ALJ should have considered is Listing 1.04(C), which provides that:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With: C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P., App. 1, § 1.04.

Listing 1.00B2b provides as follows:

> The inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

Plaintiff points out that her lumbar spine MRI from March 2011 showed severe disc degenerative disease with intervertebral space narrowing and bilateral neuroforaminal narrowing, along with spinal

canal stenosis.   Dkt. No. 12-1 at 14-15 (citing T. 272-273). Plaintiff also notes that x-rays of her lumbosacral spine from November 2009 show degenerative changes at L5-S1.   T. 252.   Even *assuming arguendo* that Plaintiff can establish the first element by showing degenerative disc disease with spinal canal stenosis resulting in the compromise of a nerve root, Plaintiff's back impairment does not meet all the specified medical criteria of Listing 1.04(C), which include an inability to ambulate effectively.

To qualify for benefits at step three, claimants must show that their impairments "meet all of the specified medical criteria" for the particular listing.   Sullivan v. Zebley, 493 U.S. 521, 530 (1990).   Here, there is no objective medical evidence in the record showing an "extreme limitation of the ability to walk," as defined in the Regulations.   Rather, treatment notes overall show that Plaintiff had a normal gait (see e.g., T. 357, 349, 270) and could walk normally heel to toe (T. 270).   Further, consultative examiner Dr. Boehlert noted that Plaintiff did not use any assistive devices, had a normal gait and stance, could walk heel to toe, could rise from a chair without difficulty, and could get on and off the exam table and change without assistance.   T. 249.   Dr. Boehlert assessed that Plaintiff had no chronic daily-term limitations.   T. 251. Moreover, Plaintiff herself testified at her hearing with respect to her mobility/ability to ambulate, specifically stating that she is able to make herself breakfast, is able to wash dishes standing

up for about 4 or 5 minutes at a time, that she drives, and that several times a week she drives herself to the grocery store, her brother's house, and her daughter's house.  T. 58-59.

Accordingly, any error in the ALJ's failure to consider whether Plaintiff's back impairment met or equaled Listing 1.04(C) is harmless because no view of the evidence would support a finding that Plaintiff's back impairment met all the specified medical criteria of Listing 1.04(C).

**B.   The ALJ's RFC Determination**

The ALJ determined that Plaintiff had the ability to perform sedentary work, except that she was limited to simple, repetitive tasks, occasional overhead reaching and must avoid concentrated exposure to respiratory irritants.  T. 20.  Plaintiff claims that the ALJ's RFC determination is flawed insofar as it is unsupported by and inconsistent with the evidence in the record and is violative of the treating physician rule.  Dkt. No. 12-1 at 15.

Initially, the opinion of a consultative examiner may constitute substantial evidence in support of an ALJ's decision. See Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995);  Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983) (citations omitted). The examination findings from consultative examiner Dr. Boehlert substantially support the ALJ's physical RFC finding.  T. 21.

Upon examination, Dr. Boehlert noted that Plaintiff appeared to be in no acute distress, her gait was normal, she could walk on

her heels and toes without difficulty, squat fully, her stance was normal, she used no assistive devices, needed no help changing for exam or getting on and off the exam table, and that she was able to rise from the chair without difficulty.  T. 249.  Dr. Boehlert noted further that Plaintiff's cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally.  No scoliosis, kyphosis, or abnormality in her thoracic spine was reported.  Dr. Boehlert reported that Plaintiff's lumbar spine showed limited flexion, but full extension, full lateral flexion bilaterally, and full rotary movements bilaterally. Dr. Boehlert also reported that Plaintiff had full range of motion in her shoulders, elbows forearms and writs bilaterally, hips, knees, and ankles bilaterally.  Dr. Boehlert reported that Plaintiff had full strength in her upper and lower extremities, no evident subulaxations, contractures, ankylosis or thickening, her joints were stable and non-tender and there was no redness, heat, swelling or effusion.  T. 250.  Dr. Boehlert also assessed that Plaintiff had no motor or sensory deficits, no muscle atrophy, her hand and finger dexterity were intact, and her grip strength was full bilaterally. Dr. Boehlert reported that diagnostic pulmonary testing revealed mild obstruction.  T. 251.  Dr. Boehlert therefore opined that Plaintiff had moderate limitation to heavy exertional activity during episodes of arthralgias, and no chronic daily long-term limitations.  T. 251.

Moreover, the ALJ properly applied the treating physician rule and afforded less than controlling weight to the opinions of treating physicians Klibanoff and Herrmann with respect to Plaintiff's physical limitations. T. 20-21. The Social Security Regulations provide that "controlling weight" will be giving to a "treating source's opinion" regarding the nature and severity of the Plaintiff's impairments. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). However, where as here, when a treating physician's opinion is inconsistent with even her own treatment notes, the ALJ may properly discount that opinion. See generally Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where that physician issued opinions inconsistent with other substantial evidence in the record).

Here, the ALJ properly afforded "some," rather than controlling weight, to treating physician Klibanoff's opinion that Plaintiff's physical functioning was significantly limited, given that his evaluation of Plaintiff's limitations was not supported by his own treatment notes. For instance, as the ALJ noted, while Dr. Klibanoff's treatment notes from June 2011 show a diagnosis of right rotator cuff tendinitis, his treatment notes also indicate that Plaintiff was managing well, overall appeared to be

comfortable, and that she was in no acute distress. Similarly, his treatment notes reflect that his examination of Plaintiff's shoulders revealed no evidence of erythema, warmth or swelling, and that her rotator cuff strength was full. T. 21, 324-325.

Likewise, the ALJ properly afforded less than controlling weight to the opinion of treating physician Dr. Herrmann who opined that Plaintiff had the RFC for less than sedentary work, given that her opinion of Plaintiff's physical limitations was also not supported by her own treatment notes. T. 21. For example, while Dr. Herrmann opined that Plaintiff suffered from a disabling orthopedic condition (T. 343), her treatment reflected that Plaintiff "continues to clean her mom's house" and that, as of April 2011, she had yet to schedule an appointment at a pain clinic. T. 21, 336.

With respect to Plaintiff's mental RFC, the ALJ properly afforded less than controlling weight to the opinion of Plaintiff's therapist, Tammie Raucci, LMSW, given that Raucci was not an acceptable medical source under the Regulations and because her opinion that Plaintiff was disabled was inconsistent with the other evidence in the record that showed an ongoing but not disabling depression. T. 20. According to SSR 06-3p, 2006 SSR LEXIS 5, "only 'acceptable medical sources' can be considered treating sources . . . whose medical opinions may be entitled to controlling weight." SSR 06-3p, 2006 SSR LEXIS 5. "Acceptable medical sources" are

further defined by regulation as licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists. 20 C.F.R. 416.913(a). In contrast, therapists are defined as "other sources" whose opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight. 20 C.F.R. 416.913(d)(1). The ALJ "has the discretion to determine the appropriate weight to accord the [other source]'s opinion based on the all evidence before him." Diaz v. Shalala, 59 F.3d 307, 314 (2d Cir. 1995).

Here, as the ALJ noted, although Raucci opined that Plaintiff's suffered from a major depressive disorder that resulted in "moderate" to "moderately severe" functional limitations, Plaintiff's mental health treatment notes overall showed that her depression was not disabling and that therapy was helping. Additionally, as the ALJ noted, treatment notes from Rochester Mental Health from March 2011 indicated that Plaintiff was comfortable on her current dose of medication and that her mood and sleep patterns were stable. T. 20, 289-291, 326-332.

Accordingly, the Court finds that the ALJ properly weighed the opinion evidence in the record and that his RFC assessment that Plaintiff retained the ability to perform sedentary work with certain limitations is supported by substantial evidence.

C.    **The ALJ's Credibility Assessment**

Plaintiff argues that, in determining her RFC, the ALJ failed to apply the appropriate legal standards for assessing her credibility. Dkt. No. 12-1 at Point C. When assessing a claimant's credibility, an ALJ may not simply state in a conclusory manner that he finds the claimant to be not credible. Rather, the ALJ's decision must contain specific reasons for his finding that are supported by evidence in the record. See SSR 96-7P, 1996 SSR LEXIS 4, 1996 WL 374186, *4 (S.S.A.). The decision must explain to the individual and a reviewing court the weight given to the testimony and the reasons for the determination. See id.

Here, the ALJ found that "[Plaintiff's] medically determinable impairments could not reasonably be expected to cause all of the alleged symptoms. The [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible, to the extent that they are inconsistent with the . . . residual functional capacity assessment." T. 20. Plaintiff argues that the ALJ failed to take into consideration and/or address her statements from October 6, 2009 that "she has been in pain for several years" and that she reported to her healthcare providers throughout the record that she was continuously in pain. Dkt. No. 12-1 at 20.

In this case, the ALJ's decision contained specific reasons supported by the evidence for discounting Plaintiff's credibility,

and he correctly evaluated Plaintiff's statements in making his RFC determination.  Tr. 20; see also SSR 96-3p, 2006 SSR LEXIS 5 and 96-7p, 1996 SSR LEXIS 4.

Specifically, Plaintiff complained of disabling orthopedic problems.  However, Plaintiff testified that she was able to lift her 7-pound grandchild, that she walked to the grocery store several times per week, and often drove her car, including driving to Virginia on one occasion.  Additionally, the ALJ noted that Plaintiff's disabling orthopedic problems were inconsistent with her statements to Dr. Herrmann that she "continued to clean her mom's house."  T. 21, 336.  The ALJ also noted that Plaintiff testified at the administrative hearing in June 2011 that her back pain is her worst health problem.  However, he pointed out that just two months earlier in April 2011, Dr. Herrmann reported that the basis of Plaintiff's disability was a mental health condition, rather than a physical condition.  T. 21, 336.

With respect to Plaintiff's complaints of respiratory problems, the ALJ pointed out that Plaintiff continued to smoke.  T. 21.

With respect to Plaintiff's complaints of depression, the ALJ noted that Plaintiff reported to her mental health providers that she was "comfortable" on her current dose of medication, that she experienced a decrease in hallucinations, that her sleep pattern was stable, and that she was "feeling better."  T. 20, 327-331.

Additionally, the ALJ noted that therapy sessions seemed to be helping Plaintiff. T. 20, 289-291.

Accordingly, the Court finds that the ALJ's credibility assessment was proper and his conclusion that Plaintiff's subjective complaints and symptoms were not credible to the extent she claimed is supported by substantial evidence in the record.

### D.   The ALJ's Step-Five Analysis

### 1.   The VE's Qualifications

Plaintiff claims that the VE who testified at her administrative hearing was not properly qualified "because no support for [his] qualifications . . . lie within the record" and thus "the opinion of the [VE] cannot be established as reliable." Dkt. No. 12-1 at 21. This argument is belied by the record.

A review of the record reflects that a letter dated May 5, 2011 was sent to a "Peter A. Manzi" requesting him to appear and give testimony as a vocational expert at Plaintiff's administrative hearing on June 13, 2011. T. 124. However, as Plaintiff correctly points out, a "Dr. Mantu" appeared at Plaintiff's administrative hearing. T. 28. Despite Dr. Mantu's appearance at the hearing, the ALJ states in his decision that Peter A. Manzi testified at the hearing. T. 16.

Indeed, Plaintiff is correct in pointing out that there is a discrepancy in the names in the record. Further, it is not clear to the Court whether "Dr. Mantu" appeared at the administrative

hearing in place of "Peter A. Manzi" or if there is simply a typo in the transcript proceedings with respect to Manzi's name.  In any event, the individual referred to as "Dr. Mantu" testified at the hearing, under oath, that his statement of qualifications was in the file and was accurate.  T. 63-64.  Moreover, Plaintiff's attorney was expressly asked by the ALJ if she had any objections to the qualifications of Dr. Mantu to serve as the vocational expert and she responded that she did not.  T. 64.  Further still, Plaintiff's attorney was afforded -- and took advantage of -- the opportunity to cross-examine the VE at the hearing.  T. 68-70.  At no point during the hearing, including during cross-examination of the VE, did Plaintiff or her attorney challenge or otherwise voice a concern over the VE's qualifications.  Therefore, this Court finds no error in the ALJ relying on the VE's opinion as an expert.

### 2. The VE's Testimony

In this case, the ALJ asked the VE to consider an individual of Plaintiff's age, education, and past work experience who could perform sedentary work, was limited to simple, repetitive tasks, occasional overhead reaching, had to avoid concentrated or excessive exposure to respiratory irritants and other environmental extremes. T. 65-66.  The VE testified that there were jobs in significant numbers in the national economy that such a person could perform, including general assembler and addresser.  T. 51.

According to the Dictionary of Occupational Titles ("DOT"),the addresser job requires "frequent[][]" reaching and the assembler job requires "constant[][]" reaching.  The former frequency is defined as "exist[ing] from 1/3 to 2/3 of the time" and the latter frequency is defined as "exist[ing] 2/3 of the time or more."  DOT 209.587-010; DOT 734.687-018.  A DOT companion publication and a Social Security policy statement define "reaching" as "[e]xtending hand(s) and arm(s) in any direction."  U.S. Dep't of Labor, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles App. C (1993) ("SCO");  SSR 85-15, 1985 SSR LEXIS 20, 1985 WL 56857, at *7;  see also SSR 00-4p, 2000 SSR LEXIS 8, 2000 WL 1898704, at *2 (ALJ must resolve any "apparent unresolved conflict" between VE testimony and DOT, which includes its "companion publication" the SCO).

Plaintiff argues that the reaching requirements of the addresser and assembler jobs identified by the VE (which require frequent and constant reaching, respectively) are inconsistent with the ALJ's RFC finding that Plaintiff was limited to "occasional overhead reaching."  Dkt. No. 12-1 at 21-22.

As an initial matter, the ALJ fulfilled his "affirmative responsibility to ask about any possible conflict between [the VE] evidence and information provided in the DOT," SSR 00-4P, 2000 SSR LEXIS 8, 2000 WL 1898704 at *4, by eliciting the VE's affirmation on two occasions that his testimony was consistent with the DOT (see

T. 67, 68).  In any event, Plaintiff's argument fails because the ALJ did not preclude Plaintiff from performing reaching altogether or from reaching altogether in any one direction (including upward). Rather, he determined that Plaintiff could perform sedentary work except that she was limited to, among other things, <u>occasional</u> <u>overhead</u> reaching.  T. 20.  Viewed in the context of the evidence as a whole, <u>see</u> <u>Ryan v. Comm'r of Soc. Sec.</u>, 528 F.3d 1194, 1198 (9th Cir. 2007), the ALJ most reasonably intended to preclude Plaintiff from doing jobs that regularly required reaching items or performing maneuvers above her head, not from ever reaching (including reaching in any upward direction).

The ALJ's RFC determination, moreover, took into account Plaintiff's shoulder impairment and the functional limitations stemming therefrom (as discussed above).  Further, Plaintiff herself testified during the hearing that she is able to reach overhead so long as she is not required to do so repetitively.  T. 46. Moreover, no medical source opined that Plaintiff was restricted from reaching altogether.

Further, the Court notes that, according to the DOT descriptions, neither of the jobs the ALJ found that Plaintiff could perform appear to be "overhead work."  Rather, the assembler job requires a person to "[i]nsert[] paper label in back of celluloid or metal advertising buttons and force[] shaped stickpin under rim." The "work-field" category for this job is listed as "folding-

-29-

fitting." DOT 734.687-018. Likewise, the addresser job requires a person to "[a]ddress[][] by hand or typewriter, envelopes, cards, advertising literature, packages, and similar items for mailing. May sort mail." The "work-field" category for this job is listed as "verbal recording-record keeping." DOT 209.587-010. The DOT descriptions for other jobs, by contrast, often indicate that they require or expressly include overhead reaching. See, e.g., DOT 520.686-022, 1991 WL 674044 (describing flour-blender-helper job as requiring "turn[ing] hand screws or moves levers to adjust gate openings of overhead storage bins to release specified amounts of flour into blender hopper"); DOT 381.687-018, 1991 WL 673258 (describing industrial-cleaner job as requiring "[c]lean[ing] lint, dust, oil, and grease from machines, overhead pipes, and conveyors"); DOT 553.686-018, 1991 WL 675263 (describing curing-press-operator job as requiring "[l]ift[ing] tires from inflating unit at end of cooling cycle and load[ing] them onto overhead conveyor").

Thus, interpreting the ALJ's findings in the manner most consistent with the medical evidence, no conflict existed among the ALJ's RFC, the VE's testimony, the DOT, and the companion publication the SCO.

The Court therefore finds that the ALJ's step five determination was proper as a matter of law and is supported by substantial evidence.

**CONCLUSION**

The Commissioner's Motion for Judgment on the Pleadings is granted, the Plaintiff's cross-motion is denied, and the Complaint is dismissed in its entirety with prejudice.

**IT IS SO ORDERED.**

**S/Michael A. Telesca**

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     May 9, 2014
           Rochester, New York